## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| **Robert Marchese,** | **Plaintiff** | Case No. _____ |
| **v.** | | |
| **CenturyLink, Inc.,** | **Defendant** | **CLASS ACTION COMPLAINT DEMAND FOR JURY TRIAL** |

Plaintiff Robert Marchese brings this action on behalf of himself and all others similarly situated, and files this Class Action Complaint against CenturyLink, Inc. ("CenturyLink," "Defendant," or "the Company"). Plaintiff alleges the following based on information and belief, the investigation of counsel, and personal knowledge as to the allegations pertaining to themselves.

### I. INTRODUCTION

1.     Plaintiff brings this class action accusing CenturyLink of running an aggressive boiler room sales operation and a sham customer service process. Through its model, CenturyLink routinely promised low prices during the sales process only to charge higher amounts and add unauthorized charges during billing. These practices bilked customers out of tens of millions of dollars.

2.     CenturyLink has sought to minimize its customers' concerns as mere "billing disputes." But this action is not about mere billing disputes. It is about CenturyLink's uniform business model; the generate-sales-at-all-costs programs it forced on its sales offices

1

and employees, the reckless incentive programs it perpetuated, and the rampant customer abuses that necessarily resulted.

3.     CenturyLink employed its hyper-aggressive sales model across its call centers, where "customer service representatives" were actually sales employees, well-trained to meet draconian sales quotas and revenue targets through any means necessary.

4.     CenturyLink's chosen business model yielded predictable results by encouraging and rewarding deceptive and other unlawful conduct. Thousands of its customers have complained of virtually uniform treatment by the Company's sales, billing, and customer service departments.

5.     Specifically, customers have routinely reported: (1) being promised one rate during the sales process but being charged a higher rate when actually billed; and (2) being charged unauthorized fees, including billing for services not ordered, for fake or duplicate accounts, for services ordered but never delivered, for services that were canceled, for equipment that was properly returned, and for early termination fees.

6.     When customers complained—and many thousands have—CenturyLink not only encouraged but rewarded its agents to deny remedying the wrongful charges and keep as much of the overcharges in the Company as possible.

7.     To retain those overcharges, CenturyLink had a pervasive and persistent practice of: denying that original prices quoted had ever in fact been quoted, that the prices or services previously offered were impossible to provide, refusing to honor price promises, denying that returned modems had in fact been returned, claiming that the company's computer systems did not show what customers had been promised, blaming the computer

2

system for making accounts inaccessible, and threatening that any attempt to cancel service would result in termination fees.

8. Even where CenturyLink representatives might, when pressed, agree to credit a customer's account for an improper charge, those credits were routinely rejected by supervisors and not applied after the fact. Supervisors were incentivized to reject those credits as their compensation was inversely impacted by credits they approved for customers.

9. As a consequence, CenturyLink now faces dozens of lawsuits accusing it of consumer fraud, deceptive sales practices, breach of contract, negligent misrepresentation, fraudulent inducement, and unjust enrichment. Two state attorneys general, from Minnesota and Arizona, have brought suit against CenturyLink and entered into consent decrees requiring the Company to immediately cease and desist from engaging in the same conduct Plaintiff alleged here. Additionally, CenturyLink shareholders have brought actions against the Company for allowing this misconduct and seeking to recover for the negative impact that misconduct had on the share price.

10. Through this Class Action Complaint, Plaintiff seeks to recover damages, injunctive relief, and all other remedies available at equity and law on behalf of themselves and all other similarly situated current and former CenturyLink customers.

## II. PARTIES

### A. DEFENDANT

**CenturyLink, Inc.**

11.　　Defendant CenturyLink, Inc. (NYSE: CTL) is a telecommunications company. It is a Louisiana corporation, headquartered in Monroe, Louisiana.[1] The Company describes itself as "the second largest U.S. telecommunications provider to global enterprise customers…[w]ith customers in more than 60 countries and an intense focus on the customer experience."[2] The Company purports to provide communications and data service to residential, business, governmental, and wholesale customers in 37 states.[3]

12.　　In Court, counsel for CenturyLink has protested that CenturyLink, Inc. is improperly named as a defendant in this action, claiming, "CenturyLink, Inc. is a parent holding company. It's a public company that issues stock in the New York Stock Exchange. It does not have any employees. It does not offer any services. It's inappropriately named. We are going to need to address those issues, Your Honor."[4]

13.　　The facts contradict CenturyLink's contention and instead show that Plaintiff and the Class only communicated to and did business with an entity that represented itself as CenturyLink.

14.　　The Company has made concerted efforts to emphasize its brand name and to hold itself out to its customers/class members as CenturyLink.

---

[1] 100 CenturyLink Drive, Monroe, LA 71203 (318.388.9000)
[2] *See* https://www.linkedin.com/company/centurylink;
http://www.centurylink.com/aboutus/company-information.html.
[3] *See* http://broadbandnow.com/CenturyLink.
[4] Dec. 12, 2017 Hr'g Tr. 29:19-23.

4

15.     The name CenturyLink and its logo are emblazoned across the Company's website, where the Company assures customers that it "understands the power of the digital world is related to our customers' specific needs."[5]

16.     The Company equates "CenturyLink" with "CenturyLink, Inc." On its website, the Company explicitly references the name "CenturyLink" with CenturyLink, Inc.'s trading symbol. For example, the Company website touts: "CenturyLink (NYSE: CTL) is a global communications and IT services company focused on connecting its customers to the power of the digital world."[6]

17.     In response to allegations of CenturyLink's overcharging and cramming, it was CenturyLink, Inc.—not some other subsidiary—which hired "independent counsel" to conduct the investigation and report the results. On December 7, 2017, it issued a press release confirming—contrary to its counsel's representations in court—that CenturyLink, Inc., in fact has: (1) "policies, procedures and practices relating to consumer sales, service, and billing;" (2) "outside directors;" (3) "employees" and "former employee(s);" (4) "customers;" (5) "management;" and (6) "products, pricing and promotions."[7]

18.     When other subsidiaries—such as Embarq—have been added to the Company, the Company has confirmed those subsidiaries will operate "under the corporate name CenturyLink…" CenturyLink did so to assure its customers that they were dealing

---

[5] *See* http://www.level3isnowcenturylink.com/en/.
[6] *See* http://ir.centurylink.com/ir-home.
[7] *See* https://www.prnewswire.com/news-releases/centurylink-announces-conclusion-of-special-committee-investigation-300568194.html.

5

with a large, national, public company who would stand behind its word and commit to linking the country together.[8]

19.     The CenturyLink name is on every uniform, truck, envelope, an NFL Stadium, and confirmed in telephone conversations with its customers. Customers write their checks to CenturyLink. Plaintiff and the Class reasonably believed they received representations, promises, and services from CenturyLink and no one else. And that was the Company's intention.[9]

**Doe Defendants**

20.     Doe Defendants 1-100.  Plaintiff at all times did business with the Company that called itself CenturyLink. To the extent there are any entities other than CenturyLink who made the promises, representations, and maneuvers complained of herein, they did so on behalf of CenturyLink and to the customer base that only knew them to be CenturyLink. Plaintiff by his own experience has been unable to identify any other defendant other than CenturyLink that has been engaged in the improper conduct alleged in this Complaint. Defendant has argued that other entities are the proper parties and responsible in some manner for the occurrences and acts alleged, and that any damages alleged were proximately caused by these other entities. If any other entities are liable for the alleged misconduct, Plaintiff is unaware of the true names and capacities of those entities sued herein as Does 1 through 100, inclusive, and therefore sue these Defendants by such fictitious names. If such

---

[8] CenturyLink, Inc.: Form 8K. June 4, 2009. Exhibit 99.1. Press Release, quoting Glen F. Post, III, CEO.

[9] *See* http://www.centurylink.com/aboutus/company-information.html: "CenturyLink (NYSE: CTL) ….. The company also serves as its customers' trusted partner…"

entities exist, Plaintiff will amend this Complaint to allege their true names and capacities when the same is ascertained in discovery. When used herein, the term "Defendant" is inclusive of CenturyLink, Inc. and DOES 1 through 100.

**B.    PLAINTIFF**

21.    Plaintiff Robert Marchese ("Marchese") is a citizen of North Carolina, residing in Wake Forest, North Carolina.

## III.  JURISDICTION AND VENUE

22.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331. This Court has supplemental jurisdiction over Plaintiff's state claims pursuant to 28 U.S.C. § 1367.

23.    This Court also has original jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d). This is a class action in which: (1) there are more than one hundred (100) members in the proposed class; (2) various members of the proposed class are citizens of states different from where Defendant is a citizen; and (3) the amount in controversy, exclusive of interest and costs, exceeds $5,000,000.00 in the aggregate.

24.    This Court has personal jurisdiction over CenturyLink because it conducts business in this District and has sufficient minimum contacts in this District. CenturyLink intentionally avails itself of this jurisdiction by transacting business and deriving substantial revenues from business activity in this District.

25.    Venue is proper in this forum pursuant to 28 U.S.C. § 1391 because CenturyLink transacts business and may be found in this District and because a substantial

portion of the allegations complained of herein, including transactions between CenturyLink and Plaintiff, occurred in the Eastern District of North Carolina.

## IV. FACTUAL BACKGROUND COMMON TO ALL CLAIMS

**CenturyLink's Acquisitions Resulted in a Cobbled-Together Operations Platform**

26.     For decades, CenturyLink operated as a small rural telephone operator. In 1989, CenturyLink began a period of aggressive acquisitions to add customers and revenue.[10]

27.     Most notable of these acquisitions were the 2009 and 2011 acquisitions of Embarq Corporation and Qwest Communications International, Inc., respectively, which gave CenturyLink market presence in 37 states.[11]



Figure 1: CenturyLink coverage map after acquiring Qwest Communications International, Inc. in 2011.

28.     Ultimately, CenturyLink's aggressive acquisition campaign made it the third largest telecommunications provider in the United States. The Company sells a variety of

---

[10] *See* http://news.centurylink.com/company-history?cat=3205,
http://news.centurylink.com/company-history?cat=3206, and
http://news.centurylink.com/company-history?cat=3207 (last accessed Jan. 23, 2018).
[11] *See* http://news.centurylink.com/company-history?cat=3208 and
http://news.centurylink.com/company-history?cat=3209 (last accessed Jan. 24, 2018).

8

products and services to its customers in thirty-seven states, including high-speed internet, local and long distance telephone services, using the local and regional networks it has acquired over time.[12] In its most recent SEC annual filing, CenturyLink reported annual revenue of $17.47 billion.

29. But as CenturyLink expanded, it chose not to adequately invest in technologies that would integrate the platforms from its various acquisitions into one cohesive sales and billing system.

30. The ongoing corporate decision not to integrate the internal computer systems has resulted in a byzantine system where it was impossible to uniformly access and share information across the myriad platforms and computer systems that comprise CenturyLink. As counsel for Defendant represented to the Court:

> [i]t happens to be the case that these systems have, in many cases, are [sic] not combined, and so those of us that have worked for the company for many years have been surprised at times to see how difficult it is to retrieve information because there is not a push of a button, as one might think there is.[13]

31. This admission by CenturyLink is precisely what its customers have experienced for many years.

32. Rather than hindering the Company's sales, its non-integrated, convoluted computer systems, comprised of numerous sales, marketing, and billing platforms across the footprints of CenturyLink's various acquisitions, actually help the Company generate revenue. Here's how.

---

[12] *See* http://news.centurylink.com/company-history?cat=3209 (last accessed Jan. 23, 2018).
[13] Tr. of Initial Status Conference, on Dec. 14, 2017, by CenturyLink counsel, Doug Lobel, at page 35.

33.     When a CenturyLink sales representative needs to quote a price to land a sale, they may or may not have access to accurate service and pricing data for that customer based on their geographic location. Despite this limitation, the sales reps are taught to do whatever it takes to land the sale – namely, quote the best price for the best services, regardless of the customer's need or CenturyLink's ability to provide that service in that location.

34.     Any conditions required to qualify for the lowest quoted price, such as signing up for autopay, agreeing to modem rental, or payment of additional fees and taxes, are routinely omitted from the sales pitch, either because the sales agent wishes to present the price as low as possible to land the sale or because the system itself does not provide all of the needed information.

35.     After the sale, the non-integrated billing system may or may not be able to recognize the services and price terms offered to and agreed upon by the customer.

36.     This leads to the rampant practice across CenturyLink of promising one price, only to have a higher price billed to the customer.

37.     No sufficient precautions are in place Company-wide to protect customers from these practices. Even the Company's own investigation found that its consumer sales monitoring lacked sufficient safeguards to detect and quantify these unauthorized charges from being added to customers' bills.[14]

38.     When customers called to dispute their bills, CenturyLink representatives lacked access to full information about that customer's account and what services CenturyLink had previously agreed to provide and at what price. The representatives,

---

[14] CenturyLink Press Release. December 7, 2017. "CenturyLink announces conclusion of Special Committee investigation."

therefore, were left to assuage the customer on the fly and in the cheapest way possible, including by denying the agreed upon price was ever possible, by arguing that there was no error and convincing the customer to simply accept the charges, or to issue a credit in an amount small enough to get the customer off the phone.

39.     CenturyLink's non-integrated sales and billing systems allowed the Company to train its sales representatives to quote whatever price was needed to get a sale, regardless of whether it could ever be provided as promised, and to evade complaining customers through confusion and deferral. In this way, CenturyLink not only avoided the expense of integrating its various acquisitions' systems, but did so with the affirmative knowledge that it would benefit financially from failing to do so.

## CenturyLink Designed its Business Model to Maximize Profits by Overcharging Customers and Avoiding Accountability

40.     With access to over 48 million potential customers across 37 states, CenturyLink has attempted to outbid existing competitors and lure customers by promising subscribers simple, low rates for its services and products. Yet as countless customers have experienced, the simple, low rates CenturyLink promises are seldom the actual amount owed when their bill arrives each month.

41.     While the Company now offers the option of product bundling to retain or attract customers, that practice has lowered profit margins. According to the Company, "While we believe our bundled service offerings can help retain customers, they also tend to lower our profit margins in the consumer segment due to the related discounts.[15]

---

[15] CenturyLink, Inc.: Form 10-Q. September 30, 2017 at p 44.

42.     To draw in customers, CenturyLink advertises its products and services at market-competitive prices. Despite these quoted rates, CenturyLink's unintegrated sales and billing platforms, coupled with its carefully designed system of promotions, exclusions, and conditions all but guarantee that those competitive rates will not be honored.

43.     At the same time, CenturyLink encourages and rewards hyper-aggressive sales tactics by implementing performance expectations and incentive programs for its sales representatives.

44.     These systems and practices are designed to create a situation in which the customer is guaranteed to lose.  On one hand, sales representatives, who have a personal incentive to open as many accounts as possible, lack the business motivation, technological ability, and time required to perform appropriate diligence to ensure correct prices are quoted, exclusions do not apply, and conditions for eligibility are met. On the other, CenturyLink enables the very sales representatives who are incentivized to maximize customer account creation to indicate the total number of services the customer signed up for in the CenturyLink system with the click of a button, without the need for customer review or approval.

45.     The foreseeable result has been that countless CenturyLink customers were, and continue to be, promised lower prices than they were ultimately charged or charged for services never agreed to, or both.

46.     CenturyLink is not only aware of such practices, it promotes those practices through its employee compensation scheme. Rather than rectifying such mistakes or refunding any monies in excess of what customers agreed to pay, CenturyLink doubles down

12

and, if customers reject whatever "workaround" the Company is willing to offer, it either charges a termination fee or sends disputed amounts to collections.

**CenturyLink Quoted Deceptive and Misleading Prices**

47.     Plaintiff and the Class purchased CenturyLink's services based on the Company's deceptive representations and promises.

48.     CenturyLink advertises the products and services it sells in various media, including television, newspapers, the internet, and flyers left at consumers' homes.

49.     CenturyLink promoted fixed monthly rates for certain stand-alone and bundled services, including high-speed internet and local and long distance telephone services. While the Company routinely promoted its simple, low rates to customers, it was fully aware that those low rates would not be delivered.

50.     Plaintiff's experiences, alleged in detail below, highlight a pervasive pattern of CenturyLink quoting one price at the point of sale, only to charge a higher price during billing.

51.     CenturyLink's improper overcharging of quoted prices has been further explained as a result of an investigation and ongoing litigation by the Attorney General for the State of Minnesota ("Minnesota AG").[16]

52.     That investigation showed that CenturyLink's "overview" pricing documents revealed a complex and elaborate pricing system where thousands of conditions, exceptions, and exclusions affected rates charged to customers.

---

[16] *See State of Minnesota v. CenturyTel Broadband Services et al.*, No. 02-CV-17-3488 (Anoka Cty. Dist. Ct. July 12, 2017).

53.     These pricing policies revealed that, despite the straightforward prices CenturyLink advertised to its customers and offered on sales calls, its true base rates are contingent upon several undisclosed factors, including, but not limited to, the speed of the customer's internet connection, the presence or absence of CenturyLink email service, and the manner in which CenturyLink connects a customer's home to the internet.

54.     CenturyLink has also admitted that the prices quoted to customers were actually often subject to numerous conditions and exceptions that were undisclosed to the customer.  In fact, each quoted price includes a matrix of complex and subtle information, including further actions the customer must take—or cannot take—after their purchase to actually obtain the quoted price.

55.     CenturyLink's non-integrated sales and billing platforms, high pressure sales quotas, and call time maximums made it all but certain that the rate quoted to customers would not be the billed rate. This is particularly true in light of the fact that CenturyLink fails to disclose the various conditions, exclusions, and exceptions at the point of sale.  In fact, CenturyLink has taken the position with the Minnesota AG that its prices are a "trade secret" that need not and cannot be disclosed to customers.

56.     Thus, when CenturyLink offered Plaintiff and the Class goods and services at certain prices, it knew that it could not deliver them for certain.

57.     CenturyLink knew or had reason to know that customers in a competitive market base their choice of telecommunications services on the quoted price, and that customers rely on the prices quoted to them.

14

**CenturyLink Promoted Overbilling Customer Accounts with Unauthorized Charges**

58.     In addition to deceptively quoting prices to customers, CenturyLink incentivized its sales representatives to bill customer accounts with unauthorized charges.

59.     CenturyLink's hyper-aggressive sales requirements and compensation structure created an environment where its sales representatives were excessively incentivized to add unauthorized products, services, and charges to customers' accounts while enabling them to input such charges into CenturyLink's system with the click of a button.

60.     Specifically, CenturyLink tied its sales representatives' and their supervisors' compensation and job security to revenue generation, requiring them to meet unrealistic quotas or face termination.

61.     As a result, customers were routinely billed for charges that were neither disclosed, authorized, nor warranted.

62.     For example, CenturyLink routinely charged internet service customers for modems that had not been requested or that had been properly returned.

63.     CenturyLink also added unauthorized charges, such as insurance, "internet cost recovery fees," and termination fees to customers' accounts. In addition, CenturyLink charged its customers for services that were never ordered, were canceled, or where customers were not receiving CenturyLink's services during specific periods of time.

64.     Plaintiff's allegations are supported by a recent whistleblower's complaint against CenturyLink.

15

65.     In 2017, a former CenturyLink employee, Heidi Heiser, filed a whistleblower complaint alleging that she was terminated as a sales representative for refusing to take part in the Company's unlawful billing practices.[17]

66.     Heiser alleged that CenturyLink imposed performance requirements, sales quotas, and call time maximums on its sales representatives while simultaneously authorizing its sales representatives to falsely indicate what terms a customer purportedly agreed to. This led sales representatives to add additional products or services to customers' accounts without the customers' knowledge or consent.

67.     According to her complaint, Heiser "learned from her work that the system and practices used by CenturyLink with its sales and other agents allowed persons who had a personal incentive to add services or lines to customer accounts to falsely indicate on the CenturyLink system the approval by a customer of new lines or services, which would then inure to the direct or indirect benefit of such CenturyLink agents or their superiors" and that the "additional lines or services resulted in additional charges not authorized by the customer."

68.     Any unauthorized charges crammed onto customer accounts could not be known to customers until after their bills arrived and, even then, could be difficult to detect. CenturyLink therefore put the onus on its customers to detect its mischarges and verify the accuracy of CenturyLink's invoices, challenging them to locate and dispute wrongful charges and prove what they agreed to.

---

[17] *See Heiser v. CenturyLink, Inc.*, No. CV2017-008928 (Maricopa Cty. Super. Ct. June 14, 2017) (hereinafter "Heiser" or "Heiser Complaint").

69.     CenturyLink was at all times not only aware that sales representatives were adding improper charges to customer accounts, but condoned the behavior. Sales representatives, such as Heiser, who reported unlawful conduct to their superiors and management were disregarded or punished. Such reports did nothing to change the culture of CenturyLink's boiler room style business model.

## CenturyLink Minimized or Denied Customer Complaints

70.     CenturyLink's business model involved not only deliberately overcharging customers' accounts but also keeping the ill-gotten revenue in house after it was obtained. This meant that complaining customers were subjected to stringent practices imposed by the business model.

71.     CenturyLink had policies for dealing with customers who disputed their wrongful invoices. As a general matter, the Company trained its sales representatives to "park the need and plant the seed." This meant ignore the customer's problem, or "park" it, and move to selling them something more (or for longer), or do whatever necessary to keep that customer's revenue in-house.

72.     To prevent sales representatives from taking the time needed to properly investigate and remedy wrongful invoices, CenturyLink imposed mandatory call time maximums (called "Average Handling Times" or "AHTs") of only a few minutes. Sales representative who violated these AHTs when trying to address customer concerns were punished, up to and including termination.

73.     CenturyLink also based compensation for sales representatives and their supervisors on how many account credits were issued and services canceled. For example,

sales representatives were authorized to issue credits to customer accounts for things such as properly returned modems, time without service, or for overcharges. However, supervisors were required to approve any credit exceeding a certain amount, and CenturyLink docked those supervisors' compensation based on the amount of credits approved. This led to supervisors routinely reducing or denying credits that had been properly issued by sales representatives.

74.     But credits were a last resort. The Company trained its sales staff to explain away overcharges and take aggressive measures to keep the revenue in house by telling customers that the system did not reflect the price the customer claimed they were entitled to; that the system indicated a modem had not been returned; that the price the customer was quoted was impossible; and other excuses.

75.     According to the whistleblower Heiser, in her experience, customers who complained about unauthorized charges were simply told that Company records indicated the customer did in fact agree to the charges, and it was the customer's word against CenturyLink's.

76.     The Minnesota AG also reported that when customers complained of being overcharged, CenturyLink would inform the customer that they had been "misquoted" or that "no one at CenturyLink can get you that price." One CenturyLink employee admitted that "maybe 1 out of 5 [customers] are quoted correctly or close enough" and that "in many cases, the customer calls in for several months and promised callbacks, [is] passed around, or cut off before going to" various consumer protection agencies.

77.     If a customer was fed up enough to cancel their service because of CenturyLink's improper sales and billing practices, the Company would charge the customer a previously undisclosed "early termination fee."

78.     Even worse, CenturyLink routinely sent customers to collections for refusing to pay unlawful overcharges.

79.     These practices reflect CenturyLink's deliberate practice of keeping as many customers on the hook for improper charges as possible rather than fulfilling its duty to bill customers according to the price and terms promised.

## Regulatory Authorities Have Targeted These Practices as Unlawful, Harmful, and Nationally Pervasive

80.     The uniform misconduct Plaintiff has alleged is not a figment of their imagination, nor is it a collection of isolated incidents.  In fact, the Federal Communications Commission ("FCC") is currently confronting the pervasive practice of cramming.  The Arizona Attorney General and the Minnesota Attorney General have also challenged CenturyLink over the Company's deceptive sales and billing practices, and have entered into consent decrees requiring CenturyLink to cease and desist engaging in the misconduct.

## A.     Federal Regulators

81.     The FCC has identified the need to reform hyper aggressive, boiler room-type sales operations in the telecommunications industry. Specifically, the FCC has focused on curtailing "cramming" in the telecommunications industry, which it defines as the placement of unauthorized charges on a consumer's bill.[18] The FCC has described cramming as a

---

[18] *See* FCC Fact Sheet, *In the Matter of Protecting Consumers from Unauthorized Carrier Charges and Related Unauthorized Charges*, CG- Docket No. 17-169 (available at

19

longstanding and "continuing problem" for consumers across the country, requiring the "need for increased consumer protection."[19]

82. In a comment to the FCC's October 2017 Notice of Proposed Rulemaking, the Communications Worker of Americas ("CWA"), a labor union representing 75,000 sales and service employees in the telecommunications industry—including CenturyLink's employees—spoke out against boiler room-type sales models and their relationship to customer abuses. According to the CWA:

> Companies that impose unrealistically high sales quotas on sales and service representatives are responsible for driving unethical sales practices. Certainly, that was the conclusion reached by the Consumer Financial Protection Bureau in its investigation of Wells Fargo's infamous fraudulent account scandal….
> Similar to Wells Fargo, many telecommunications carriers have adopted unrealistically high sales quotas, incentive pay compensation plans, and performance management systems that force sales and service representatives to engage in unethical sales practices in order to meet the quotas or earn sales incentives. Aggressive performance management systems discipline sales employees for failure to make the sales quota and revenue benchmarks.[20] Typically, failure to meet sales quotas for three time periods can lead to

---

https://apps.fcc.gov/edocs_public/attachmatch/DOC-345475A1.pdf)(last visited February 12, 2018).

[19] *Id.* at 3. State attorneys general have confirmed that cramming violates state consumer protection laws. *See e.g.*, Arizona Attorney General website ("Cramming is the illegal practice of adding features to your existing service and charging for them on your cell phone or landline bill without your permission. Both are illegal under Arizona's Consumer Fraud Act:") https://www.azag.gov/consumer/slam-cram; In the Matter of Qwest Corporation, d/b/a/ CenturyLink QC, No. CV2016-002842 (Maricopa Cty. Super. Ct. Apr. 4, 2016) (confirming future violations will violate Arizona Consumer Fraud Act).

[20] See, *In the Matter of Wells Fargo Bank, Consumer Financial Protection Bureau*, Consent Order (Sept. 8, 2016). Available at:
http://files.consumerfinance.gov/f/documents/092016_cfpb_WFBconsentorder.pdf *See also*, "Consumer Financial Protection Bureau Fines Wells Fargo $100 Million for Widespread Illegal Practice of Secretly Opening Unauthorized Accounts," Consumer Financial Protection Bureau, press release (Sept. 8, 2016) Available at:
https://www.consumerfinance.gov/about-us/newsroom/consumer-financial-protection-bureau-fines-wells-fargo-100- million-widespread-illegal-practice-secretly-opening-unauthorized-accounts/.

termination. The constant pressure to sell privileges sales over attention to quality customer service and leads to high rates of stress-related illness for employees."[21]

## B.  State Attorneys General Investigations and Related Consent Decrees

83.      The Arizona Attorney General asserted allegations of deceptive sales and billing practices against CenturyLink that were fundamentally similar to those asserted by Plaintiff here.

84.      On April 6, 2016, CenturyLink entered into an Assurance of Discontinuance with the Arizona Attorney General relating to that conduct.[22]

85.      Among other things, the Assurance of Discontinuance required CenturyLink to:

    a.      Comply with the Arizona Consumer Fraud Act;

    b.      In response to customer orders, provide a written confirmation within three business days setting forth all material terms and conditions applicable to the customers' order, free from additional advertisements;

    c.      Investigate customer allegations of overcharging rather than sending a customer's account to an outside collection agency, until such investigation is complete;

    d.      Refrain from misrepresenting the speed of internet service available;

---

[21] Reply Comments of Communications Works of America, *In Matter of Protecting Consumers from Unauthorized Carrier Charges and Related Unauthorized Charges*, CG- Docket No. 17-169, October 13, 2017 (available at https://ecfsapi.fcc.gov/file/10132178310677/CWA%20Reply%20Comments%20-%20Slamming%2C%20cramming%20-%2010-2017.pdf).
[22] *See In the Matter of Qwest Corporation, d/b/a/ CenturyLink QC*, No. CV2016-002842 (Maricopa Cty. Super. Ct. Apr. 4, 2016).

e.  Process a customer's service cancellation request within three business days; and

f.  Provide a summary of this Assurance of Discontinuance to all employees and third parties who perform customer sales or service functions for CenturyLink in the State of Arizona.

86.  Similarly, on July 12, 2017, the Minnesota Attorney General filed a complaint against CenturyLink for its unlawful sales and billing practices involving similar allegations as Plaintiff has raised here.

87.  On October 23, 2017, CenturyLink entered into a Stipulated Order with the Minnesota Attorney General.  Among other things, CenturyLink agreed to:

a.  Not make any false statement of material fact or omit any material fact in connection with the sale of internet and/or television services to Minnesota consumers; and

b.  Provide, at the time of sale:

i.  The monthly base price of the services purchased;

ii.  The amount of each monthly recurring fee in addition to the monthly base price;

iii.  The amount of monthly access recovery charges;

iv.  All one-time fees charged to the initial bill;

v.  The amount of the first invoice;

vi.  Recurring total costs;

vii.  Total duration of the agreement; and

22

viii.    Any restrictions or conditions on a consumer's ability to receive the quoted price.

88.    The Minnesota Attorney General's action remains ongoing in Anoka County District Court as of the date of this Class Action Complaint.

89.    Despite entering into these Agreements with the Arizona and Minnesota Attorneys General, CenturyLink has failed to make its customers whole for overcharges and unauthorized fees and, upon information and belief, continues to engage in this same misconduct.

## V.  PLAINTIFF'S EXPERIENCES WITH CENTURYLINK

**Robert Marchese**

90.    Plaintiff Robert Marchese ("Marchese") has been a CenturyLink customer and lives in Wake Forest, North Carolina.

91.    In 2005, Marchese established service with CenturyLink for internet and telephone services.

92.    When he signed up, CenturyLink offered Marchese a price of approximately $88 per month. Two years ago, Marchese signed up for the "Price for Life" contract with CenturyLink. CenturyLink offered Marchese a price of $68 per month.

93.    Each month, Marchese's bill was higher than the $68 per month he was offered, and currently is $88 per month.

94.    Marchese called CenturyLink each month to dispute his bill. The CenturyLink representatives continuously offered Marchese the "Price for Life" contract for $89 per month. Marchese continued to inform the CenturyLink sales representatives that he was

23

already under a contract for "Price for Life" at $68 per month. The CenturyLink sales representatives would explain that "Price for Life" was a new deal and there was no way that he could already be under that contract.

95. CenturyLink refused to correct the overcharging. Marchese continued to be overcharged each month.

96. As a result of CenturyLink's misconduct, Marchese has been damaged and incurred financial loss in an amount to be determined at trial.

## VI. CLASS ALLEGATIONS

97. This action is brought, and may be properly maintained, as a class action under Rule 23 of the Federal Rules of Civil Procedure. All requisite elements of Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3) are satisfied; there is a well-defined community of interests in the litigation; the proposed Class and any subclass are ascertainable; and a single class action is the superior manner to proceed when compared to the joinder of hundreds of thousands of plaintiffs or tens of thousands of individual cases challenging the same practices.

98. Plaintiff brings this action individually on behalf of himself, and in a representative capacity on behalf of the Class and Subclass defined below, for which Plaintiff is a member, under Rule 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure seeking damages, restitution, injunctive and declaratory relief pursuant to the applicable laws set forth in the state law counts below. The Class is defined as:

> All persons or entities in the United States who, during the Class Period, had an account for telephone or internet services with Defendant.

99. Within the Class is a North Carolina state Subclass. The Subclass is defined as follows:

24

- **North Carolina Subclass:** All persons or entities who, during the Class Period, had an account for telephone and/or internet services with Defendant in the State of North Carolina ("North Carolina Subclass" or "North Carolina Subclass Member(s)").

100.    The Class Period for the Class and Subclass dates back to the longest applicable statute of limitations for any claims asserted on behalf of that Class or Subclass from the date this action was commenced and continues through the present and to the date of judgment.

101.    Excluded from the Class and Subclass is Defendant, its current employees, co-conspirators, officers, directors, legal representatives, heirs, successors and wholly or partly owned subsidiaries or affiliated companies; the undersigned counsel for Plaintiff; and the judge and court staff to whom this case is assigned. Plaintiff reserves the right to amend the definition of the Class or Subclass if discovery or further investigation reveals that they should be expanded or otherwise modified.

102.    This action satisfies the predominance, commonality, typicality, numerosity, superiority, adequacy, and all other requirements of Rule 23 of the Federal Rules of Civil Procedure.

- **Numerosity**: The proposed Class and Subclass is so numerous that the individual joinder of all members is impractical under the circumstances of this case. The proposed Class and Subclass consists of at least tens of thousands of Defendant's customers. This is shown, *inter alia*, by the state coverage statistics Century Link publishes on https://www.highspeedinternet.com/providers/centurylink. The widespread

and pervasive impact of the challenged practices on Defendant's customers is shown, *inter alia*, by the Minnesota and Arizona Attorney General investigations and complaints; the statements of former CenturyLink employees, and other customer complaints. While the exact number of Class members and Subclass members is currently unknown, Plaintiff is informed and believes, and thereon alleges, that thousands of customers across the country and in each state CenturyLink operates have been victimized by CenturyLink's practices, in the manner described above.

- **Commonality**:  Common questions of law and fact exist as to all members of the Class and Subclass, and predominate over any questions that affect only individual members of the Class and Subclass.  The practices at issue are not isolated incidents but instead are widespread, common, and systematic practices affecting large groups of Defendant's customers in each applicable state, as shown, *inter alia*, by the Attorney General actions brought against Defendant in Arizona and Minnesota, as well as other complaints and customer accounts.[23] The common questions of law and fact include, but are not limited to:

  i.  Whether Defendant charged Plaintiff and the Class more than agreed upon prices;

---

[23] *See e.g.*, Ramos v. Qwest Corp dba CenturyLink, No. 16-cv-05642 (W.D. Wash.); *See also*, https://www.complaintboard.com/centurylink-l3215.html; https://www.reddit.com/r/Denver/comments/2s8ei5/illegitimate_collections_attempt_for _cancelled/; https://creditboards.com/forums/index.php?showtopic=542494; http://www.dslreports.com/forum/r28909565-being-charged-for-modem-i-returned.

ii. Whether Defendant made misrepresentations or omissions of material fact about its quoted monthly prices and the nature of its telecommunications services and billings;

iii. Whether Defendant breached implied or explicit contractual obligations to its subscribers or deceptively billed for services not being offered, not contemplated, or not agreed upon;

iv. Whether Defendant breached the implied covenant of good faith and fair dealing made part of all contracts;

v. Whether Defendant added unauthorized charges to Plaintiff's and Class members' accounts;

vi. Whether Defendant opened or maintained duplicate or multiple unauthorized accounts in its customers' names;

vii. Whether Defendant maintained incentive programs which encouraged employees and agents to overcharge Class members for services Class members did not order or approve;

viii. Whether Defendant failed to provide safeguards to prevent the misconduct at issue;

ix. Whether Defendant engaged in a practice or act with intent to sell, distribute, increase the consumption of its services, or with intent to induce the public in any manner to enter into any contract or obligation relating to its services, made, published, disseminated, circulated or otherwise placed before the public an advertisement, announcement, statement or representation of any kind to the public relating to such services or to the terms or conditions thereof, which advertisement, announcement, statement or representation contains any assertion, representation or statement of fact which is untrue, deceptive, or misleading;

x. Whether Defendant maintained a policy of shifting responsibility to its customers to discover overcharges as opposed to billing and collecting fees from consumers accurately and in good faith;

xi. Whether Defendant engaged in a practice or act that it knew or reasonably should have known to be an unfair practice, deception, fraud, false pretense, or false promise, or the misrepresentation, concealment, suppression, or omission of a material fact related to

27

the advertisement, sale, or lease of equipment and telephone and internet services;

xii. Whether Defendant intended to cause confusion or misunderstanding among consumers regarding the prices of its telecommunications services and whether Defendant intended not to honor its offered prices;

xiii. Whether Defendant has been unjustly enriched;

xiv. Whether Plaintiff and the Class were harmed and suffered damages as a result of Defendant's conduct and, if so, the appropriate amount thereof; and

xv. Whether, as a result of Defendant's misconduct, Plaintiff and the Class are entitled to equitable relief, and if so, the nature of such relief.

- **Typicality**: Plaintiff's claims are typical of the claims of the members of the Class and Subclass to which they belong. Plaintiff is a member of the Class, as well as the respective Subclass for the state in which he resides. Plaintiff was subjected to Defendant's common business practices, described above, and asserts common legal claims that are typical of those of the Class and Subclass. Plaintiff and the members of the Class and Subclass sustained damages arising out of Defendant's wrongful and deceptive conduct as alleged herein, and face the risk of further harm unless enjoined. Resolution of the common issues presented in Plaintiff's cases will resolve them in a common and typical manner for other members of the Class and Subclass.

- **Adequacy of Representation**: Plaintiff and the undersigned counsel will fairly and adequately protect the interests of the Class members. Plaintiff is knowledgeable about his claims and practices complained of; is prepared to

28

prosecute the claims in the best interests of the Class and Subclass; has no interest that is adverse to the interests of the other members of the Class and Subclass; and has hired counsel experienced in class actions and complex litigation to represent the Class and Subclass. The undersigned counsel are sufficiently experienced in complex litigation; are prepared to prosecute this action in the best interest of the Class and Subclass; and have no conflicts with the members of the Class or Subclass.

- **Superiority**: A class action is superior to other available means for the fair and efficient adjudication of this controversy. Because individual joinder of all Class members is impracticable, class action treatment will permit many similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without unnecessary duplication of effort and expense that numerous individual actions would engender. The expenses and burdens of individual litigation would make it difficult or impossible for individual members of the Class and Subclass to redress the wrongs done to them, while important public interests will be served by addressing the matter as a class action. The cost to, and burden on, the court system by adjudicating individualized litigation would be substantial, and significantly more than the costs and burdens of a class action. Class litigation will also prevent the potential for inconsistent or contradictory judgments.

103.     A Class should also be certified under Fed. R. Civ. P. 23(b)(2). Defendant has acted or refused to act on grounds generally applicable to the Class and Subclass, making appropriate final injunctive relief or corresponding declaratory relief with respect to the Classes.

104.     In the alternative, this Class and Subclass may be certified under Fed. R. Civ. P. 23(c)(4) with respect to particular issues.

## VII.  CLAIMS FOR RELIEF

### COUNT I
### VIOLATIONS OF 47 U.S.C. §§ 201, *et seq.* and 47 C.F.R. § 64.2401

### (On Behalf of All Class Members)

105.     Plaintiff realleges and incorporates each allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

106.     CenturyLink is a common carrier engaged in interstate communication by wire for the purpose of furnishing communication services as defined in 47 U.S.C.§ 201(a) of the Federal Communications Act ("Communications Act").

107.     Carriers are responsible for the conduct of third parties acting on the carrier's behalf, *See* 47 U.S.C. § 217 ("In construing and enforcing the provisions of this chapter, the act, omission, or failure of any officer, agent, or other person acting for or employed by any common carrier or user, acting within the scope of his employment, shall in every case be also deemed to be the act, omission, or failure of such carrier or user as well as that of the person.").

30

108. Section 201(b) of the Communications Act prohibits "unjust" and "unreasonable" practices "in connection with such communication service." At all times relevant hereto, 47 U.S.C.§ 201(b), provided, in relevant part, as follows:

> All charges, practices, classifications, and regulations for and in connection with such communication service [*i.e.*, interstate or foreign communication by wire or radio], shall be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is declared to be unlawful…

109. CenturyLink's practice of billing and collecting unauthorized charges from Plaintiff and the Class is neither just nor reasonable and is, in fact, unjust and unreasonable, and violates 47 U.S.C. § 201.

110. At all times relevant hereto, 47 C.F.R. § 64.2401, entitled "Truth-in-Billing Requirements," provided, in relevant part, as follows:

> (b) Descriptions of billed charges. Charges contained on telephone bills must be accompanied by a brief, clear, non-misleading, plain language description of the service or services rendered. The description must be sufficiently clear in presentation and specific enough in content so that customers can accurately assess that the services for which they are billed correspond to those that they have requested and received, and that the costs assessed for those services conform to their understanding of the price charged…

> (d) Clear and conspicuous disclosure of inquiry contacts. Telephone bills must contain clear and conspicuous disclosure of any information that the subscriber may need to make inquiries about, or contest, charges on the bill.

111. The charges contained on CenturyLink's bills were not accompanied by "clear, non-misleading, plain language description of the service or services rendered" nor did they "contain clear and conspicuous disclosure of any information that the subscriber may need to make inquiries about, or contest, charges on the bill," in violation of 47 C.F.R. § 64.2401.

112. CenturyLink is liable to Plaintiff and the Class for damages and attorneys' fees, pursuant to 47 U.S.C. § 206, which provides as follows:

31

> In case any common carrier shall do, or cause or permit to be done, any act, matter, or thing in this chapter prohibited or declared to be unlawful . . . such common carrier shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of any such violation of the provisions of this chapter, together with a reasonable counsel or attorney's fee . . .

113. As a direct and proximate result of CenturyLink's violations, Plaintiff and the Class suffered damages, and pursuant to 47 U.S.C. § 207 are entitled to recover, as follows:

> Any person claiming to be damaged by any common carrier subject to the provisions of this chapter may . . . bring suit for the recovery of the damages for which such common carrier may be liable under the provisions of this chapter, in any district court of the United States of competent jurisdiction. . .

114. 488. As a result of the foregoing, Plaintiff and the Class are entitled to, among other things, compensatory damages, restitution, an accounting, and all other relief deemed just and equitable by the Court.

## COUNT II
## BREACH OF CONTRACT

## (On Behalf of All Class Members)

115. Plaintiff realleges and incorporates each allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

116. Plaintiff and each member of the Class received an offer for services from Defendant, agreed to pay, and did pay Defendant for the provision of services and products at agreed upon costs. In doing so, Plaintiff and each member of the Class entered into a contract with Defendant.

117. Defendant expressly and/or impliedly agreed to bill and collect only for authorized charges.

32

118.     Defendant breached these obligations by billing and collecting more than agreed upon, billing for unauthorized charges, and by providing bills that were unclear and misleading.

119.     Defendant's acts, imposing unauthorized charges on Class members' accounts, were intentional and willful.

120.     Defendant routinely overcharged Plaintiff and the Class in breach of their offers and contracts, implied or express. Defendant failed to deliver telephone or internet services and related products at the promised price. Plaintiff and Class members were charged excessive amounts that they did not agree to pay.

121.     Alternatively or additionally, Plaintiff and Class members were charged for services or products that they did not purchase or had properly canceled.

122.     Alternatively or additionally, Plaintiff and Class members were charged improper termination fees, or were charged for products they had returned, or had accounts prematurely sent to collections when they refused to pay wrongful fees.

123.     Plaintiff and Class members paid Defendant for these services or products and in all other respects performed or substantially performed their obligations under the contracts.  Defendant was not authorized or justified in charging Plaintiff and the Class for unauthorized amounts.

124.     An implied covenant of good faith and fair dealing is part of all contracts. Defendant breached its contractual obligation of good faith and fair dealing, implied in all contracts, by billing and collecting for unauthorized charges.

33

125.     Defendant's conduct in breaching the contracts in the above-described manner was not isolated but was rather systematic, pervasive, persistent, and a direct result of business policies and practices implemented to maximize Defendant's revenue.

126.     Plaintiff and the Class were injured, harmed, and incurred financial loss by way of Defendant's above-described conduct in amounts to be determined at trial.

127.     Plaintiff and the Class did not voluntarily pay the unauthorized charges in dispute.  At the time it occurs, most consumers are unaware that they have been subjected to unauthorized charges and/or have been a victim of cramming.  When Plaintiff discovered the billings they protested and demanded refunds, including through this action.  Further, Plaintiff was under duress to pay the improper amounts on threat of having their essential services cancelled and/or interrupted.

128.     As a result of the foregoing, Plaintiff and the Class are entitled to, among other things, compensatory damages and all other relief deemed just and equitable by the Court.

## COUNT III
## BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING

### (On Behalf of All North Carolina Subclass Members)

129.     Plaintiff realleges and incorporates each allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

130.     This count is asserted by members of the North Carolina Subclass ("Count III Subclass").

131.	The laws of these states recognize that a separate duty of good faith and fair dealing arises out of a contractual relationship, the breach of which is a separate tort independent from any corresponding breach of contract.

132.	The implied covenant of good faith and fair dealing prohibits a party from acting in a manner to prevent other parties to the contract from receiving the benefits and entitlements of the agreement.

133.	Defendant expressly and/or impliedly agreed to bill and collect only for authorized charges and for agreed upon prices, and expressly and/or impliedly agreed to provide clear and non-misleading phone bills.

134.	Defendant breached these obligations by billing and collecting unauthorized charges, by charging more than agreed upon, and by providing telephone bills that were unclear and misleading.

135.	Defendant's acts imposing unauthorized or excessive charges on Class member's accounts were intentional, willful, unfair, and conducted in bad faith.

136.	When engaging in the actions set forth above, Defendant acted with the intent to deprive Plaintiff and members of the Subclass of their contractual rights.

137.	By these actions, Defendant breached the implied covenant of good faith and fair dealing. Defendant breached its duties by failing to act fairly or in good faith.

138.	Plaintiff and members of the Count III Subclass were injured, harmed, and incurred financial loss by way of Defendant's conduct in amounts to be determined at trial.

139.     As a result of the foregoing, Plaintiff and the members of the Count III Subclass are entitled to, among other things, damages, restitution, an accounting, and all other relief deemed just and equitable by the Court.

## COUNT IV
## VIOLATION OF THE LOUISIANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW, LA. REV. STAT. ANN. §§ 51-1401-1430 ("LUTPA")

### (On Behalf of All Class Members)

140.     Plaintiff realleges and incorporates each allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

141.     This count is asserted by Plaintiff on behalf of members of the Class.

142.     Plaintiff and the Class assert this claim against Defendant for engaging in the misconduct described herein, which violates the Louisiana Unfair Trade Practices and Consumer Protection Law, La. Rev. Stat. Ann. §§ 51-1401-1430 ("LUTPA").

143.     This claim is based on Defendant's deceptive and misleading conduct and common omissions of material fact, including charging its customer more for services than agreed to and charging for unauthorized fees or services.

144.     LUTPA is remedial in nature and broadly prohibits deceptive, unfair, and misleading practices towards consumers in the course of business, including those alleged to have been conducted by Defendant as described herein.

145.     Plaintiff and Class members are persons within the meaning of LUTPA with standing to assert this claim.

146.     The items for which Defendant charged Plaintiff and the Class are goods, services, and/or merchandise within the meaning of LUTPA.

36

147.     Defendant charged Plaintiff and the Class for the goods, services and merchandise at issue.

148.     As described in this Complaint, Defendant systematically and regularly engaged in: (1) bait and switch tactics where customers were promised one price during the sale and then charged a higher price at billing; and (2) imposing unlawful charges for services or products never ordered, for services that had been canceled, for equipment that was never ordered, for products that were properly returned, for improper termination fees, and for other unauthorized charges. These practices were not isolated incidents but rather the result of widespread, systematic, pervasive, and persistent conduct and business policies adopted and aimed at maximizing Defendant's revenue.[24]

149.     LUTPA prohibits unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce. The elements comprising a consumer claim for damages under LUTPA are: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages.

150.     Defendant here intended to outbid its competitors and lure customers by engaging in the foregoing deceptive conduct.

151.     Defendant engaged in unfair and deceptive acts and practices that violated LUTPA, causing Plaintiff and the Class injury and financial loss. Additionally, the risk of future injury remains unless Defendant is enjoined.

---

[24] *See e.g.*, Assurance of Discontinuance between Qwest Corp. d/b/a/ Century Link QC and Attorney General of Arizona, *In the Matter of Qwest Corp. d/b/a CenturyLink QC*, No. CV 2016-002842 (Ariz. Sup. Ct., Apr. 13, 2016) (confirming that such practices, if continued to be engaged in, serve as prima facie evidence of a violation of the Arizona Consumer Fraud Act.).

152.     As alleged, CenturyLink, through its employees and agents, has engaged in a pattern and practice of deceptive and misleading activity, and collection of monies by way of false pretenses. Defendant engaged in deceptive, unconscionable, and/or unfair business practices by, among other things: (a) causing Plaintiff and the Class to be billed for charges they did not request or authorize; and (b) billing at higher rates than those quoted.

153.     Price is a material term to consumers. The amounts charged, collected, and auto-deducted from bank accounts (or otherwise billed and collected) are material terms to CenturyLink customers. Deceptively overcharging customers in a manner that is difficult to detect within a short time period is a material misrepresentation or an omission of material fact to reasonable consumers. As explained in the Heiser complaint and in the proceedings brought by the Minnesota and Arizona Attorneys General, the practices at issue occurred in a regular and continuous manner that injured Plaintiff and the Class.

154.     Defendant never informed Plaintiff and the Class that it maintained internal incentive programs aimed at increasing its revenues by charging customers unauthorized charges. The omission of such facts was material, as reasonable consumers contemplating transactions with Defendant, either initially or on an ongoing basis, would have wanted to know about such practices prior to engaging in such transactions. Reasonable consumers, had they been made aware of such facts would have acted differently, including but not limited to—if able—acquiring their telecommunication services or products from alternative providers.

155.     Defendant had a duty to disclose material facts to Plaintiff and the Class. The information was in the exclusive possession of Defendant and not obtainable by Plaintiff

and Class members from other sources. Additionally, Defendant made partial statements about price in the form of sales representations and billing statements. Having spoken and provided partial information, Defendant had an affirmative duty to fully disclose all facts.

156. The practices described herein were intended to, and were likely to, deceive consumers acting reasonably in the same circumstances. Defendant intended Class members to rely on it to accurately sell and bill them only for services requested and at prices promised. Defendant failed to do so and instead intentionally overcharged Plaintiff and the Class.

157. Under LUTPA, an objective test is employed in determining whether a practice is likely to deceive a consumer acting reasonably. That is, a party asserting a deceptive trade practice need not show actual reliance on the representation or omission at issue.

158. Defendant acted with the intent that Plaintiff and the Class rely on its concealment, suppression, or omission, in connection with the sale or advertisement of its products and services, and therefore engaged in unlawful practices in violation of LUTPA. The amounts Defendant overcharged each customer each month are relatively small (less than $200). Defendant knows that customers may not immediately notice such discrepancies and seek corrections. Defendant sought to exploit and take advantage of that dynamic.

490. By engaging in this misconduct, Defendant violated LUTPA, including, but not limited to, La. Rev. Stat. Ann. § 51-1403 ("Any consumer contract, express or implied, made by any person, firm, or corporation in violation of this Chapter is an illegal contract and no recovery thereon shall be had."), and § 1405 ("Unfair methods of competition and unfair or

deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.").

159. LUTPA applies to transactions between a Louisiana-based merchant, like CenturyLink, and out-of-state consumers. La. Rev. Stat. Ann. § 51-1418(A).

160. Plaintiff and the Class lost money and were injured by Defendant's deceptive, unconscionable, and/or unfair business practices in amounts to be determined at trial.

161. The misconduct alleged is continuing and will continue until Defendant is enjoined. Defendant engaged in the misconduct described for profit and as a deliberate corporate policy, rather than as an isolated incident. Defendant's conduct was morally wrong, callous, and/or oppressive.

162. Plaintiff has satisfied all prerequisites for filing this claim, including the provision of any pre-filing notice. Any further delays in pursuing this claim would be futile as Defendant continues to engage in the practices complained of and has given no indication that it intends to change its practices, policies, or provide refunds or other relief to all Plaintiff, Class, and Subclass members.

163. As a result of the foregoing, Plaintiff and the Class are entitled to, among other things, compensatory damages, any statutory damages and penalties allowed by law, restitution, an accounting, injunctive and declaratory relief, and all other relief deemed just and equitable by the Court, including but not limited to reasonable attorneys' fees and costs.

## COUNT V
## NEGLIGENT MISREPRESENTATION

### (On Behalf of All Class Members)

40

164.     Plaintiff realleges and incorporates each allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

165.     This Count is asserted on behalf of the Class.

166.     One who, in the course of business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

167.     Throughout the course of its business, Defendant incorrectly and unlawfully represented sales and billing information to Plaintiff and the Class. Defendant frequently billed Plaintiff and the Class at rates higher than those quoted, and similarly, inappropriately billed Plaintiff and the Class for unrequested services, inapplicable fees, and incorrectly bundled services, among other improper charges.  Defendant represented one price for its services and products but then regularly charged higher rates than originally disclosed.

168.     Defendant's omissions of material fact toward Class members, as described herein, were deceptive and misleading.

169.     Defendant was in a superior position to know material facts regarding its sales and billing practices, but failed to disclose them to Plaintiff and the Class.

170.     Due to its superior position, exclusive knowledge, and partial disclosures, Defendant had a duty to disclose the material facts it concealed from Plaintiff and the Class regarding the described misconduct.

41

171.     Defendant knew of the misleading nature of its statements because it concealed  material facts. Defendant induced Plaintiff and the Class to pay more than agreed.

172.     CenturyLink was negligent and reckless in making its omissions, as it had a duty to provide accurate and complete information with care to its customers, who had a right to rely on that information. CenturyLink breached that duty by providing inaccurate information and concealing material facts without exercising due care to ensure Class members were fully and accurately informed.

173.     Plaintiff and the Class justifiably relied on Defendant's omissions of material fact.  Had Defendant informed Plaintiff and the Class of material facts, they would have acted differently, including but not limited to—if able—taking steps not to transact with Defendant and/or to obtain their internet and telephone services from alternative  providers who did not engage in cramming and other deceptive practices.

174.     CenturyLink's negligent misrepresentations and omissions proximately caused harm to Plaintiff and the Class.

175.     As a result of the foregoing, Plaintiff and the Class are entitled to, among other things damages, an accounting, and all other relief deemed just and equitable by the Court.

**COUNT VI**
**FRAUDULENT INDUCEMENT**

**(On Behalf of All Class Members)**

176.     Plaintiff realleges and incorporates each allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

177.     This count is asserted on behalf of the Class.

42

178.   CenturyLink falsely represented and/or omitted material facts that were susceptible of knowledge, with the intent of inducing Plaintiff and Class to act.

179.   Plaintiff and the Class justifiably relied on the representation and/or omissions, and suffered damages as a proximate cause of that reliance.

180.   Here, CenturyLink falsely and unlawfully represented and/or omitted material facts to Plaintiff and the Class, namely in its billing and sales practices, that it engaged in cramming and employee incentive and bonus programs which incentivized employees to engage in such deceptive practices. CenturyLink billed Plaintiff and the Class at rates higher than those promised, and similarly, inappropriately billed Plaintiff and the Class for unrequested services, inapplicable fees, and incorrectly bundled services, among other unauthorized charges.

181.   CenturyLink's representations were untrue, misleading, unfair, and susceptible of knowledge. Further, Century Link's material omissions were deceptive.

182.   CenturyLink had superior knowledge and was in exclusive control of the material facts at issue. It had a duty to disclose them to Plaintiff and the Class.

183.   CenturyLink made its false representations and omissions with the intent of inducing Plaintiff and the Class to obtain and continue paying for services from CenturyLink.

184.   Plaintiff and members of the Class justifiably relied on CenturyLink's false information and omissions.

185.   CenturyLink's false information and omissions proximately caused harm to Plaintiff and the Class.

186.     As a result of the foregoing, Plaintiff and the Class are entitled to, among other things damages, an accounting, and all other relief deemed just and equitable by the Court.

## COUNT VII
## UNJUST ENRICHMENT

## (On Behalf of All Class Members)

187.     Plaintiff realleges and incorporates each allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

188.     This Count is asserted on behalf of the Class.

189.     As a result of Defendant's unlawful, unfair, deceptive, and wrongful acts and omissions, customers bore the brunt of the excessive and unauthorized charges and ended up paying millions of dollars while the Company unjustly reaped profits.

190.     As alleged herein, Defendant was unjustly enriched at the expense of Plaintiff and Class members, who were grossly and inequitably overcharged for Defendant's telecommunications products and services.

191.     Defendant unjustly deprived Plaintiff and Class members of money they overpaid due to the Company's deceptive sales and billing practices.

192.     Defendant's retention of this ill-gotten revenue is unjust and inequitable because Defendant used illegal, deceptive, and unfair business practices to induce or otherwise mislead customers to open, purchase, and/or retain Defendant's products and services.

193.     Defendant's retention of this revenue is also unjust and inequitable because Defendant used illegal, deceptive, and unfair business practices to bill customers for services

44

neither requested nor provided. Plaintiff and/or Class members had to pay these unauthorized charges in order to move, and to avoid collections and/or adverse consequences to their credit rating. Defendant received a benefit for products and/or services that Plaintiff did not bargain for.

194. Defendant was aware of the benefit it was receiving as a result of its unlawful, unfair, deceptive, and wrongful acts and omissions, and has enjoyed the benefits of its financial gains to the detriment and at the expense of Plaintiff and Class members.

195. Defendant's retention of the non-gratuitous benefits conferred by Plaintiff and Class members is unjust and inequitable. Plaintiff and Class members are entitled to seek restitution and all other relief as deemed just and equitable, including but not limited to, an order requiring Defendant to disgorge all profits, benefits, and other compensation obtained by virtue of its wrongful conduct.

196. This claim is asserted as an alternative to Plaintiff's claim for breach of contract and in recognition that any contracts executed by Plaintiff and Class members may be void or voidable.

197. Plaintiff and the Class directly conferred a benefit upon Defendant through their overpayments.

198. Defendant was aware of the benefit it was receiving as a result of its unlawful, unfair, deceptive, and wrongful acts and omissions, and has enjoyed the benefits of its financial gains to the detriment and at the expense of Plaintiff and members of the Class.

45

199. Defendant's retention of the improper amounts gained through its wrongful acts and practices was inequitable and unjust. Plaintiff and the Class paid these improper amounts to Defendant in reliance on its material misrepresentations and omissions of fact.

200. Plaintiff and members of the Class have no adequate remedy at law.

201. Plaintiff and members of the Class are entitled to seek restitution and other relief from Defendant, including but not limited to, an order requiring Defendant to disgorge all profits, benefits, and other compensation obtained through and for its wrongful conduct.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself, the Class, and Subclass, respectfully request that the Court:

1. Certify the Class and Subclass pursuant to Fed. R. Civ. P. 23 and appoint Plaintiff and their counsel to represent the Class and Subclass pursuant to Fed. R. Civ. P. 23(g);

2. Award Plaintiff, the Class, and Subclass monetary damages as allowable by law;

3. Award Plaintiff, the Class, and Subclass pre-judgment and post-judgment interest as allowable by law;

4. Award Plaintiff, the Class, and Subclass reasonable attorneys' fees and costs as allowable by law;

5. Award Plaintiff, the Class, and Subclass all appropriate equitable relief; and

46

6.  Award Plaintiff, the Class, and Subclass all such further relief as allowable by law and equity.

**JURY TRIAL DEMAND**

Plaintiff, on behalf of himself, the Class, and Subclass, demand a trial by jury on all issues so triable.

Dated: May 9, 2018                    Respectfully submitted,

                                      *s/T. Ryan Langley*

**HODGE & LANGLEY LAW FIRM, P.C.**
T. Ryan Langley
Fed Bar No.: 10047
Charles J. Hodge
Fed Bar No.: 1893
229 Magnolia Street
Spartanburg, SC 29306
Telephone (864) 585-3873
Rlangley@hodgelawfirm.com

**ZIMMERMAN REED LLP**

Carolyn G. Anderson (MN 275712)
Brian C. Gudmundson (MN 336695)
Bryce D. Riddle (MN 398019)
1100 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Telephone: (612) 341-0400
Facsimile: (612) 641-0844
carolyn.anderson@zimmreed.com
brian.gudmundson@zimmreed.com
bryce.riddle@zimmreed.com

**ZIMMERMAN REED LLP**
Hart L. Robinovitch
14646 N. Kierland Blvd., Suite 145
Scottsdale, AZ 85254
Telephone: (480) 348-6400
Facsimile: (480) 348-6415
hart.robinovitch@zimmreed.com

47

**O'MARA LAW GROUP**
Mark M. O'Mara
Channa Lloyd
Alyssa J. Flood
Caitlin H. Reese
221 NE Ivanhoe Blvd., Suite 200
Orlando, FL 32804
Telephone: (407) 898-5151
Facsimile: (407) 898-2468
mark@omaralawgroup.com
channa@omaralawgroup.com
alyssa@omaralawgroup.com
caitlin@omaralawgroup.com

**GERAGOS & GERAGOS, APC**
Mark J. Geragos
Benjamin J. Meiselas
Historic Engine Co. No. 28
644 South Figueroa Street
Los Angeles, CA 90017-3411
Telephone: (231) 625-3900
Facsimile: (231) 232-3255
mark@geragos.com
meiselas@geragos.com

**GERAGOS & GERAGOS, APC**
Lori G. Feldman
7 West 24th Street
New York, NY 10010
Telephone: (917) 388-3121
lori@geragos.com

*Counsel for Plaintiffs and the Proposed Class*